Eastern District of Kentucky
FILED

JAN 20 2026

AT LEXINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE EASTERN DISTRICT OF KENTUCKY
# FRANKFORT DIVISION

|  |  |
|---|---|
| MAHAMADOU KONATE,<br>Plaintiff,<br><br>vs.<br><br>DEAN J. THELEN; and SQUARE ONE<br>TRANSPORT, INC.,<br>Defendant(s) | ) Case No.: 5: 26 - CV-17 - GFVT<br>)<br>)<br>)<br>) **PLAINTIFF'S ORIGINAL COMPLAINT**<br>)<br>)<br>)<br>)<br>) |

NOW COMES MAHAMADOU KONATE, Plaintiff, and files this Original Complaint against DEAN J. THELEN and SQUARE ONE TRANSPORT, INC., and for cause would show this Honorable Court as follows:

## A. PARTIES

1.     Plaintiff, MAHAMADOU KONATE (hereinafter "Plaintiff"), is an adult individual residing in the Commonwealth of Kentucky.

2.     Defendant SQUARE ONE TRANSPORT, INC. (hereinafter "Square One" or "the Company") is a for-profit trucking corporation organized under the laws of the State of Michigan, with its principal place of business in Michigan. Square One conducts substantial business in the Commonwealth of Kentucky.

PLAINTIFF'S ORIGINAL COMPLAINT - 1

3.     Defendant DEAN J. THELEN (hereinafter "Thelen") is an adult individual and, upon information and belief, is the owner, president, and/or managing agent of Square One. At all relevant times, Thelen acted within the scope of his employment and agency with Square One. Thelen is a resident of the State of Michigan.

## B.  JURISDICTION AND VENUE

4.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiff (a citizen of Kentucky) and Defendants (citizens of Michigan), and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District. These include, but are not limited to: (a) the motor vehicle collision in Franklin County, Kentucky; (b) the investigation and crash report prepared by the Franklin County Sheriff's Office; (c) the fire response and investigation conducted by the Frankfort Fire Department; (d) Plaintiff's emergency treatment and hospitalization in Lexington, Kentucky; (e) the defamatory statements, threats, and harassment directed at Plaintiff while he was hospitalized in this District; and (f) the injuries, damages, pain, suffering, and economic harm suffered by Plaintiff in Kentucky.

## C. STATEMENT OF FACTS

6.      On January 12, 2025, at approximately 11:00 p.m., Plaintiff was operating as a driver under the exclusive authority, direction, and control of Defendant Square One Transport, Inc., pursuant to an Independent Contractor Agreement whose terms and operational realities subjected Plaintiff to Square One's control over dispatch, branding, insurance, safety compliance, and regulatory obligations.

7.      Plaintiff operated a Sprinter van used exclusively for Square One's business. As a mandatory condition of performing services, Plaintiff was required to display Square One Transport's logos and identifying markings on both sides of the vehicle. Plaintiff had no discretion to remove or alter this branding. To the public, law enforcement, insurers, and third parties, Plaintiff appeared as a Square One Transport driver acting on the company's behalf.

8.      At the time of the incident, Plaintiff was acting within the course and scope of his work duties. Although not hauling freight at that moment, Plaintiff was returning from vehicle maintenance and obtaining equipment necessary for continued over-the-road service. Plaintiff routinely lived and slept in the vehicle for weeks at a time and remained subject to federal hours-of-service regulations and Square One's operational authority.

9.      At all material times, Square One, as the authorized motor carrier under Department of Transportation and Federal Motor Carrier Safety Administration ("FMCSA") regulations, maintained the requisite insurance coverage for its operations, including coverage for accidents involving its contracted vehicles.

10.      Pursuant to industry standards, FMCSA regulations, and the operational realities of the parties' relationship, Square One bore the legal and contractual duty to manage and report accidents to its insurer. Plaintiff, as the contracted driver, was obligated to immediately notify Square One of any accident, which he did.

11.     Plaintiff fulfilled his obligation, notifying Defendants of the accident promptly after it occurred. At the time of this notification, Plaintiff's standing under the Contract was unambiguous; he was an active contractor in good standing, as evidenced by regular dispatch communications and the absence of any prior disciplinary or suspension notices.

12.     Rather than initiate the required insurance claim process or offer assistance, Defendant Thelen commenced a campaign of intimidation and harassment against the injured Plaintiff. This began while Plaintiff was receiving hospital treatment for his concussion and other injuries.

13.     In a phone call to Plaintiff's hospital room, Thelen explicitly threatened Plaintiff, stating that if he pursued an insurance claim, he would be investigated and jailed for arson, falsely asserting Plaintiff had set his own vehicle on fire.

14.     Thelen pressured Plaintiff to "walk away" and abandon any insurance claim, imposing a two-hour ultimatum for Plaintiff to acquiesce to this extortionate demand. Thelen falsely represented that he would file a claim if Plaintiff did not comply, knowing this would trigger a hostile investigation.

15.     Critically, Defendants willfully and knowingly refused to file the mandatory insurance claim, abandoning their regulatory and implicit contractual duty to Plaintiff. This refusal was later exposed as part of a deceptive pattern when Thelen, in an email dated January 20, 2025, falsely told Plaintiff the claim had been submitted, while insurance records confirm it was not filed until January 22, 2025, only after Plaintiff filed it himself.

16.     After enduring days of threats and inaction, Plaintiff was forced to report the accident to the insurance company himself on or about January 22, 2025, to protect his rights.

17.     Prior to and following this report, Defendant Thelen actively communicated with the insurance company and its claims adjusters. In these communications, Thelen, on behalf of Square One,

made definitive, false, and defamatory statements of fact, accusing Plaintiff of committing criminal acts, including insurance fraud and intentionally committing arson by setting his vehicle ablaze.

18.    These accusations were knowingly false, made with reckless disregard for the truth, and with actual malice. They were directly contradicted by the official Kentucky State Police Report and the subsequent Fire Investigator's Report, neither of which contained any finding or suggestion of fraud, criminal activity, or arson. Defendants possessed no factual basis for their criminal allegations.

19.    Thelen's defamatory statements were calculated to and did directly interfere with Plaintiff's contractual and beneficial relationship with the insurer. These falsehoods poisoned the claims process, causing the adjuster to treat Plaintiff with unjustified suspicion, to delay the adjustment of his valid claim, and to subject him to an intrusive, burdensome investigation predicated entirely on the Defendants' fabricated narrative of criminal conduct.

20.    The harassment continued in a subsequent phone conversation, which Plaintiff lawfully recorded pursuant to Kentucky's one-party consent statute. In this recording, Defendant Thelen repeatedly insulted Plaintiff, calling him a "moron," and persistently reiterated the baseless and defamatory accusation that Plaintiff had committed arson, stating he and his "insurance guy" were both convinced of Plaintiff's guilt.

21.    Following Plaintiff's defiance of the ultimatum and his filing of the insurance claim, Defendants engaged in unlawful retaliation. They falsely declared Plaintiff was "suspended" without cause or explanation, cut off his access to operational systems, and ceased all business relations.

22.    This so-called suspension, implemented immediately after the dispute over the insurance claim, was a sham pretext for a constructive termination in retaliation for Plaintiff exercising his right to pursue an insurance claim for a legitimate accident.

23.    As a direct and proximate result of Defendants' wrongful acts, including defamation, intentional infliction of emotional distress, tortious interference, and negligence, Plaintiff has suffered and continues to suffer severe damages.

24.    These include but are not limited to: profound emotional distress, anxiety, humiliation, and exacerbation of post-accident trauma; grave damage to his personal and professional reputation as a commercial driver; pecuniary losses from the delayed and obstructed insurance claim process; and significant loss of income and business opportunity from the retaliatory termination of his contracting relationship with Square One.

## D. CAUSES OF ACTION

### a. COUNT I: Defamation

25.    Plaintiff hereby incorporates all foregoing paragraphs of this Complaint by reference as though set out in full herein.

26.    Defendants, through the actions of their agent, principal, and owner Dean J. Thelen, published false and defamatory statements of fact concerning Plaintiff to third parties.

27.    Specifically, upon information and belief, Defendant Thelen, acting within the scope of his authority with and on behalf of Defendant Square One Transport, Inc., communicated directly with the company's commercial auto liability insurer and/or its claims adjusters following the January 12, 2025 accident.

28.    In those communications, Thelen asserted that Plaintiff had engaged in criminal conduct, including committing insurance fraud and intentionally setting fire to his own vehicle (arson).

29.    These accusations were not made in a private dispute between the parties but were deliberately published to the insurance entity responsible for adjudicating Plaintiff's claim, thereby

PLAINTIFF'S ORIGINAL COMPLAINT - 6

injecting the falsehoods into a quasi-judicial claims process and ensuring their consideration by neutral third parties.

30.    The aforementioned statements constitute defamation *per se* under the laws of the Commonwealth of Kentucky. Accusations that an individual has committed serious crimes involving moral turpitude and dishonesty, such as fraud and arson, are categorically defamatory on their face.

31.    Such allegations inherently tend to injure a person's reputation in the community, diminish their standing among fellow citizens, and prejudice their professional opportunities, especially in a regulated industry like commercial trucking where trust and compliance are paramount.

32.    No extrinsic evidence is required to establish the defamatory nature of accusing an individual of felonious acts designed to illicitly obtain insurance proceeds.

33.    The defamatory statements were false. The official Kentucky Uniform Police Traffic Collision Report by the Franklin County Sheriff contains no indication of suspected fraud or arson.

34.    Furthermore, a professional fire investigator's report, commissioned by the very insurer Defendants contacted, likewise provided no evidence to support a conclusion of intentional burning.

35.    The statements were made with actual malice, that is, with knowledge of their falsity or with reckless disregard for the truth. Defendants had no factual basis for the criminal allegations, as demonstrated by the official reports.

36.    Their reckless disregard is further evidenced by Thelen's contradictory representations; he emailed Plaintiff on January 20, 2025, claiming the insurance claim had been submitted, while the insurer confirmed it was not filed until January 22, 2025, after Plaintiff filed it himself.

37.    This sequence reveals a pattern of deceit concerning the entire claims process, underpinning the malicious nature of the parallel false statements about Plaintiff's conduct. These

communications were not privileged, as they were not made in a judicial proceeding and were instead part of a bad-faith effort to obstruct a legitimate insurance claim and retaliate against Plaintiff.

38.    As a direct and proximate result of Defendants' defamation, Plaintiff has suffered substantial and specific damages. The false criminal accusations directly interfered with his contractual right to insurance benefits, causing unwarranted delay, prompting an unnecessarily adversarial and invasive investigation, and poisoning his relationship with the adjuster, who treated Plaintiff as a criminal suspect.

39.    This defamation also caused severe harm to Plaintiff's personal and professional reputation within the trucking industry, a close-knit community where such allegations circulate rapidly.

40.    The emotional distress caused by the accident, a near-fatal event resulting in a concussion, was exponentially exacerbated by the trauma of being falsely branded a criminal by his own client while seeking necessary benefits.

41.    The defamation served as the direct catalyst for Defendants' subsequent retaliatory suspension and constructive termination of their relationship with Plaintiff, compounding his financial losses.

42.    All such damages were the foreseeable consequence of Defendants' malicious publication of false criminal accusations to a key third-party arbiter of Plaintiff's rights and benefits.

### b.  COUNT II: Intentional Infliction of Emotional Distress

43.    Plaintiff hereby incorporates all foregoing paragraphs of this Complaint by reference as though set out in full herein.

44.    The conduct of Defendants exceeded the bounds of ordinary commercial dispute, descending into a campaign of psychological terror that is shocking to the conscience.

45. At the very moment Plaintiff lay hospitalized, physically broken and cognitively impaired from a near-fatal accident, Defendant Thelen, as the president of Square One Transport, chose to wield threats as a weapon. This was not a single impulsive act, but a sustained assault.

46. It began with a calculated phone call to a hospital room, where a concussed man was coerced with threats of imprisonment if he dared to seek the insurance benefits crucial to his survival and livelihood. This exploitation of profound vulnerability is the hallmark of outrageous conduct.

47. The cruelty was then systematized through the deliberate dissemination of false criminal accusations to Plaintiff's insurer, transforming a lifeline into a source of persecution and stigmatizing him as a felon.

48. Finally, it was personalized through degrading insults meant to break his spirit. Viewed together, these actions form a mosaic of abuse that no civilized society should tolerate, representing a fundamental betrayal of the basic duty to refrain from inflicting severe mental suffering.

49. Defendants acted with a conscious desire to cause severe emotional anguish, or with such a reckless indifference to the certainty of that result that the law treats it as intent. They knew of Plaintiff's dire medical state, yet they deliberately weaponized his trauma.

50. Choosing to threaten a hospitalized individual with jail is an act of psychological predation, not mere business negotiation. Fabricating a story of arson and fraud to an insurance company is not a casual misstatement; it is a deliberate act designed to trigger a hostile investigation, delay vital benefits, and inflict the acute stress of being branded a criminal.

51. Every step was taken with an awareness of the power imbalance and of Plaintiff's compromised capacity to defend himself. This was intentional cruelty, leveraging his moment of greatest weakness to force his submission, and when that failed, to punish his resilience with character assassination and professional obliteration.

52.   As a direct consequence, Plaintiff has sustained a profound and enduring psychological injury, distinct from and compounded upon his physical wounds. The severe emotional distress he endures is not fleeting worry but a debilitating condition that has grafted onto his post-accident recovery.

53.   The trauma of the crash is now intertwined with the trauma of the betrayal, the hypervigilance, the humiliation, and the deep-seated fear instilled by those who held economic power over him. His concussion recovery was poisoned by panic; his focus on healing was shattered by harassment.

54.   No reasonable person, already grappling with the aftermath of a life-threatening event, could be expected to withstand such a malicious, multi-front assault on his dignity, livelihood, and sanity.

55.   The distress is severe, it is ongoing, and it is a direct and foreseeable product of Defendants' choice to inflict pain.

### c.   COUNT III: Tortious Interference with Contractual Relations

56.   Plaintiff hereby incorporates all foregoing paragraphs of this Complaint by reference as though set out in full herein.

57.   The foundation of this claim is the valid and enforceable contractual relationship between Plaintiff and the insurance carrier, a relationship in which Plaintiff held the vested legal status of a third-party beneficiary.

58.   Defendant Square One Transport, as the federally authorized motor carrier, was legally obligated to maintain liability and cargo insurance for the protection of the public and, critically, for the operators under its authority.

59.    Plaintiff, as a contracted operator, was an intended and direct beneficiary of this mandatory insurance policy. His expectancy of benefits under this contract was not merely speculative but was a concrete legal right attaching upon the occurrence of a covered event, the January 12, 2025 accident.

60.    These benefits included the prompt and good-faith investigation of his claim, payment for the catastrophic loss of his vehicle (his primary instrument of livelihood), coverage for his significant bodily injuries, and a legal defense and indemnity against any third-party claims.

61.    This protected contractual expectancy is a legally recognized interest under Kentucky common law, separate from his motor carrier agreement, and is precisely the type of business relationship this tort is designed to safeguard.

62.    Defendants, and particularly Defendant Thelen as the alter ego and principal agent of the corporate Defendant, possessed actual knowledge of this contractual relationship. This knowledge is irrefutably demonstrated by Thelen's central role in controlling the claims process, his specific threats to fill the insurance claim himself, and his admissions in recorded conversations that he had already consulted with his insurance guy regarding the incident.

63.    With full awareness of Plaintiff's rights, Defendants embarked on a course of intentional, unjustified, and improper interference. The improper means employed were egregious and independently tortious: the deliberate and malicious publication of knowingly false statements to the insurance carrier, accusing Plaintiff of felony crimes including fraud and arson.

64.    These statements were not made in good faith or pursuant to any legitimate interest; their sole purpose was improper. The purpose was threefold: first, to retaliate against Plaintiff for suffering an accident that inconvenienced the company; second, to deliberately sabotage his insurance claim to avoid

potential premium increases or scrutiny of the company's safety record; and third, to coerce Plaintiff into abandoning his claim through intimidation.

65.     The use of false criminal accusations constitutes wrongful means per se, satisfying the "improper" element of this tort.

66.     Defendants' wrongful interference was the direct and proximate cause of a material breach in the insurer's performance of its contractual obligations to Plaintiff. The insurer's implied covenant of good faith and fair dealing, a fundamental component of the insurance contract, was utterly corrupted by Defendants' injection of fabricated criminality into the claims process.

67.     Induced by Defendants' falsehoods, the insurer breached its duty to Plaintiff by abandoning an objective, fair evaluation of his claim. Instead, it initiated a hostile, suspicious, and protracted investigation predicated on the presumption of fraud.

68.     This breach manifested as an unreasonable delay in benefits, the imposition of burdensome and duplicative investigative demands (such as the unnecessary hiring of a fire investigator), and the infliction of adversarial harassment by the insurer's adjusters, who treated Plaintiff as a criminal suspect rather than a policy beneficiary. The direct causal chain from Defendants' false statements to the insurer's breached duties is clear and uncompromised.

69.     As a direct and foreseeable result of Defendants' tortious interference, Plaintiff has suffered substantial, compensable damages across multiple dimensions.

70.     These include:

    i.      Economic Damages: Financial losses from the critical delay in receiving insurance proceeds, which prevented him from replacing his vehicle, returning to work, and covering mounting medical and living expenses, thereby exacerbating the financial catastrophe of the initial accident;

ii.   Non-Economic Damages: Profound emotional distress and anguish arising from the betrayal of having his essential contractual safety net weaponized against him, compounding the trauma of his near-fatal injuries;

iii.   Consequential Damages: The value of time, resources, and effort expended to counteract the fraudulent narrative and rehabilitate his standing with the insurer; and

iv.   Reputational Harm: The degradation of his professional reputation and credibility in the records of the insurance carrier, which may impair future insurability and business relationships. Defendants' conduct was willful, malicious, and without a scintilla of justification, entitling Plaintiff to full compensation for all resultant harms.

### d.   COUNT IV: Negligence

71.   Plaintiff hereby incorporates all foregoing paragraphs of this Complaint by reference as though set out in full herein.

72.   At all material times, Defendant Square One Transport, Inc., as a federally authorized motor carrier and the party with whom Plaintiff contracted, owed a non-delegable duty of care to Plaintiff, a driver operating under its authority.

73.   This duty arose from the special relationship inherent in the motor carrier arrangement, where the carrier maintains operational control, secures insurance, and assumes responsibility for regulatory compliance.

74.   Specifically, this duty obligated Square One to act as a reasonably prudent motor carrier in like circumstances. This included, but was not limited to:

(a) Complying with all applicable Federal Motor Carrier Safety Administration (FMCSA) regulations, including the requirements to maintain continuous proof of

financial responsibility under 49 C.F.R. Part 387, which necessarily obligates the carrier to promptly report accidents to its insurer to preserve such coverage;

(b) Exercising reasonable care in its communications about Plaintiff to third parties, including refraining from making unsubstantiated and harmful accusations; and

(c) Adequately supervising and controlling its agents, including Defendant Thelen, to prevent foreseeable harm to those within the scope of their business relationship.

75.    This duty exists independently of any specific contractual term and is grounded in public policy and common law principles of reasonable conduct.

76.    Square One breached this fundamental duty of care through a series of reckless and irresponsible acts and omissions. First, Square One breached its duty by willfully and inexplicably failing to promptly report the January 12, 2025 accident to its insurer.

77.    Despite immediate notification from Plaintiff and its own regulatory and contractual obligations, the company, through its agent Thelen, actively resisted filing a claim, instead using the delay as leverage to threaten and coerce Plaintiff.

78.    Second, Square One breached its duty by making, or allowing its agent to make, reckless and false accusations of criminal fraud and arson about Plaintiff to its insurance carrier. These statements were made without any reasonable factual basis, as confirmed by the official Police and Fire Investigation reports, and were disseminated to a third party with a foreseeable and high probability of causing severe harm to Plaintiff's interests.

79.    Third, Square One breached its duty by failing to control its agent, Thelen. The company permitted, ratified, or was deliberately indifferent to Thelen's campaign of harassment, which included threatening an injured man in the hospital with jail time, engaging in vile personal insults, and intentionally interfering with a critical insurance claim.

80.     This collective failure to act prudently and to police its own agent's conduct represents a profound departure from the standard of care.

81.     The aforementioned breaches were not mere inadvertence or simple negligence. Square One, through the conscious actions of its principal Thelen, acted with conscious disregard for the rights and safety of Plaintiff.

82.     The choice to threaten rather than assist, to defame rather than report, and to retaliate rather than cooperate, demonstrates a willful indifference to the predictable and severe consequences for Plaintiff.

83.     Such conduct, which shocks the conscience and transcends mere carelessness, constitutes gross negligence and willful and wanton misconduct, warranting an award of punitive damages to punish the wrongdoer and deter similar future conduct.

84.     These breaches directly and proximately caused foreseeable and substantial harm to Plaintiff. The failure to report the claim delayed the insurance process, prolonging Plaintiff's financial uncertainty and vehicle recovery.

85.     The false accusations poisoned his relationship with the insurer, causing intrusive investigations, delays in benefits, and stigma. The harassment and threats, coming while Plaintiff was medically vulnerable, significantly exacerbated his post-accident emotional distress, compounding the trauma of the collision itself.

86.     The entire course of conduct damaged his professional reputation and led directly to his effective termination. Each element of harm, emotional, reputational, and economic, was a natural and probable consequence of Square One's negligent and grossly negligent breaches of its duties.

### e.   COUNT V: Breach of Statutory Duty (Violation of FMCSA Reporting Obligations)

87.   Plaintiff hereby incorporates all foregoing paragraphs of this Complaint by reference as though set out in full herein.

88.   Defendant Square One Transport, Inc. is a federally authorized "motor carrier" as defined by 49 C.F.R. § 390.5 and is subject to the comprehensive and mandatory safety and financial responsibility regulations enacted by the Federal Motor Carrier Safety Administration (FMCSA).

89.   As a condition of obtaining and maintaining its Department of Transportation operating authority, Square One voluntarily submitted itself to this stringent federal regulatory scheme, which is designed to protect the public and participants in the interstate trucking industry, including contracted drivers operating under the carrier's mantle.

90.   The FMCSA's regulatory framework, and specifically 49 C.F.R. Part 387, "Minimum Levels of Financial Responsibility for Motor Carriers," establishes non-negotiable duties that form the bedrock of public safety in interstate commerce.

91.   These regulations obligate motor carriers to continuously maintain proof of a valid insurance policy or other financial security (under 49 C.F.R. § 387.7) in prescribed minimum amounts. This requirement is not merely a bureaucratic formality; it is the essential mechanism that ensures victims of accidents involving commercial vehicles have a guaranteed source of compensation.

92.   Crucially, the validity of this mandatory insurance coverage is contractually and practically predicated on the carrier's duty to promptly notify its insurer of any accident. A carrier's failure to report an accident directly jeopardizes the activation of that coverage, thereby gutting the very protection the regulations are designed to guarantee.

93.   Thus, an implicit but fundamental duty integral to compliance with 49 C.F.R. Part 387 is the duty to promptly report accidents to the insurer to ensure the financial responsibility mechanism

functions as Congress and the FMCSA intended, for the protection of the traveling public and the carrier's own drivers.

94.   The catastrophic event of January 12, 2025, which resulted in disabling damage to Plaintiff's commercial vehicle requiring tow-away and caused Plaintiff to suffer a concussion and other bodily injuries requiring immediate medical attention, unequivocally meets the FMCSA's definition of a recordable "accident" pursuant to 49 C.F.R. § 390.5.

95.   This classification triggered a cascade of responsibilities for Square One as the authorized carrier, including its core duty to activate the financial responsibility safeguards by immediately notifying its insurance provider. The event was not a minor incident but a serious accident squarely within the contemplation of the federal safety regulations.

96.   Square One breached this mandatory statutory and regulatory duty in a willful and knowing manner. Its failure to promptly report the accident was not an inadvertent administrative lapse; it was an active, strategic, and bad-faith decision.

97.   Square One, through Defendant Thelen, intentionally withheld reporting to use the unreported claim as coercive leverage against the injured Plaintiff. This conduct transformed a straightforward regulatory obligation into a tool for harassment and intimidation, blatantly violating the duty to act as a responsible motor carrier.

98.   The breach was compounded when Thelen, acting for Square One, later made false statements to the insurer, further corrupting the reporting and claims process the regulations are designed to uphold.

99.   The express purpose of the FMCSA's financial responsibility rules is to ensure that injured parties are not left destitute by the failures of motor carriers and that carriers operate with a guaranteed means of covering liability.

100.    Plaintiff is precisely the type of intended beneficiary these rules protect: a driver injured while operating under the carrier's authority, reliant on the carrier's fulfillment of its duty to ensure insurance coverage is accessible.

101.    Square One's breach directly contravened this protective purpose, leaving Plaintiff to fend for himself in the critical days following a near-fatal accident.

102.    Square One's breach of its fundamental reporting duty was the direct and proximate cause of substantial and foreseeable harm to Plaintiff.

103.    The direct consequences included: (a) an unreasonable and prejudicial delay in the initiation and processing of his essential insurance claim, prolonging his financial uncertainty and impeding his ability to recover his vehicle and livelihood; (b) severe financial strain and insecurity during his most vulnerable period of physical recovery, as medical and living expenses mounted without the support of a functioning claim; and (c) a profound exacerbation of his emotional and psychological distress, as the carrier's bad-faith refusal to report forced him to navigate a complex insurance process alone while simultaneously battling the carrier's own defamatory accusations.

104.    Each of these harms is a direct link in the causal chain originating from Square One's dereliction of its federally mandated duties.

### f.    COUNT VI: Civil Conspiracy

105.    Plaintiff hereby incorporates all foregoing paragraphs of this Complaint by reference as though set out in full herein.

106.    Upon information and belief, at all relevant times following the accident of January 12, 2025, Defendants Square One Transport, Inc. and its owner and principal, Dean J. Thelen, entered into

an unlawful combination, confederation, and agreement with agents of the relevant insurance carrier, including the assigned claims adjuster.

107. The common design and mutual objective of this conspiracy were to willfully, maliciously, and unlawfully injure Plaintiff by any means necessary to obstruct, devalue, and ultimately deny his rightful claim for insurance benefits under the policy maintained by Square One, thereby protecting the company's financial interests and shielding it from potential premium increases or scrutiny.

108. This agreement was formed with the specific intent to cause financial and reputational harm to Plaintiff and was manifested through a coordinated campaign of threats, false reports, and bad-faith conduct designed to sabotage his claim from its inception.

109. The conspirators pursued their unlawful objective through a sequence of coordinated, overt acts.

110. The initial overt act was Defendant Thelen's coercive communication to Plaintiff while he was receiving emergency hospital care, threatening him with criminal prosecution and imprisonment if he did not abandon his insurance claim, an act intended to create a foundation of fear and dissuade the legitimate initiation of the claims process.

111. Following Plaintiff's refusal to capitulate to this extortionate demand, the conspirators advanced their scheme by fabricating and disseminating a false narrative of criminal fraud and arson.

112. Critically, Defendant Thelen, in a recorded conversation, revealed the coordinated nature of this fabrication by stating that both he and the insurance adjuster already "knew" Plaintiff had set the vehicle on fire, demonstrating a pre-concerted meeting of the minds to prejudice the claim with baseless accusations before any independent investigation could occur.

113. This false narrative was then formally communicated to the insurance carrier, constituting a further overt act where the Square One Defendants provided the malicious pretext and the Insurer Defendants, acting in concert, accepted and operationalized it as the basis for their claims handling.

114. In direct furtherance of the conspiracy, the Insurer Defendants subsequently initiated an intrusive, adversarial, and harassing investigation premised entirely on the Square One Defendants' false accusations, deliberately treating Plaintiff as a criminal suspect rather than a covered claimant, which caused unreasonable delay and inflicted additional emotional distress.

115. The final, retaliatory overt act executed by the Square One Defendants was the suspension and effective termination of Plaintiff's contract under the false guise of a legitimate "suspension," an action taken solely because Plaintiff defied the conspiracy by independently filing his insurance claim.

116. Each of these acts was wrongful, unlawful, and tortious in itself, including defamation, intentional interference with contractual relations, and intentional infliction of emotional distress, and each was committed with actual malice and the specific intent to injure Plaintiff as part of the common design.

117. As a direct and proximate result of this civil conspiracy and the tortious acts committed in its furtherance, Plaintiff has suffered substantial and compensable damages.

118. These damages include the total loss of his contracting relationship and his source of income and livelihood; severe and ongoing emotional distress, anguish, and humiliation arising from being targeted by a coordinated campaign of criminal defamation and threats; significant financial expenses, losses, and uncertainty caused by the wrongful delay, impairment, and increased burden placed upon his insurance claim process; and lasting harm to his personal and professional reputation within the trucking industry.

119.    The Defendants, as joint tortfeasors acting in concert, should be held jointly and severally liable for the entirety of the harm caused by their conspiracy.

120.    Furthermore, their conduct was willful, wanton, malicious, and undertaken with reckless indifference to Plaintiff's rights, thereby justifying an award of punitive damages to punish such wrongdoing and deter similar conduct in the future.

### g.    COUNT VII: Negligent Supervision and Retention

121.    Plaintiff hereby incorporates all foregoing paragraphs of this Complaint by reference as though set out in full herein.

122.    At all material times, Defendant Dean J. Thelen was the owner, president, and/or a principal corporate officer of Defendant Square One Transport, Inc., acting as its alter ego with direct operational control and the authority to speak for and bind the company.

123.    Square One knew or, in the exercise of reasonable care, should have known of Thelen's unfitness, dangerous propensities, and propensity for reckless and malicious conduct in the management of the company's affairs and its interactions with contracted drivers.

124.    Despite this knowledge, which is demonstrated by Thelen's position of ultimate authority and the absence of any meaningful corporate oversight, Square One negligently failed to supervise, control, discipline, or remove Thelen from his position of authority to prevent foreseeable harm to individuals, such as Plaintiff, who were in a business relationship with the corporation.

125.    Defendant Square One owed a direct and non-delegable duty to Plaintiff, and to others similarly situated, to exercise reasonable care in the supervision and retention of its high-ranking officers to prevent them from using their corporate authority to inflict intentional harm, engage in criminal defamation, or violate fundamental regulatory obligations.

126.   This duty arises from the special relationship inherent in the motor carrier-contractor framework, the company's exclusive control over its corporate governance, and the foreseeable risk of harm posed by an unsupervised corporate principal wielding the company's power.

127.   Square One further breached its independent duties under the Federal Motor Carrier Safety Administration (FMCSA) regulations, which implicitly require carriers to maintain adequate internal controls to ensure compliance with safety and financial responsibility rules, a duty utterly abandoned by ceding unchecked authority to Thelen.

128.   Square One breached this duty of care through its complete and systemic failure to implement any reasonable policies, procedures, or oversight mechanisms to constrain Thelen's conduct.

129.   This breach is manifest in the corporation's enabling of Thelen to: (a) threaten an injured contractor with criminal prosecution while in the hospital; (b) willfully violate FMCSA reporting mandates by refusing to file an insurance claim as a coercive tactic; (c) communicate vicious, baseless criminal accusations to the company's insurer for the purpose of sabotaging a claim; and (d) retaliate by terminating a contractor for refusing to participate in this scheme.

130.   Square One provided Thelen with the full instrumentality of the corporation, its operating authority, its insurance relationships, and its contractual power, without any safeguard, effectively ratifying his tortious conduct.

131.   The company's failure to supervise was not mere negligence but was grossly negligent and demonstrated a conscious disregard for the rights and safety of those within its operational sphere.

132.   The foregoing breaches were the direct and proximate cause of Plaintiff's injuries. Had Square One exercised reasonable care in supervising its principal officer, the campaign of threats, defamation, and bad-faith claims interference would have been prevented.

133.   Square One's negligent failure to control Thelen directly resulted in the exacerbation of Plaintiff's emotional distress, the destruction of his professional relationship and income, the malicious damage to his reputation, and the costly obstruction of his insurance benefits.

134.   The harm suffered by Plaintiff was the precise, foreseeable consequence of vesting a corporate officer with unfettered authority to handle sensitive accident and claims matters without oversight, especially when dealing with vulnerable, injured contractors.

### E.  PRAYER FOR RELIEF

REASONS WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests this Honorable Court to GRANT judgment in his favor and against Defendants, jointly and severally, as follows:

i.   For compensatory damages in the amount  of $5,000,000.00 for all losses proximately caused by Defendants' acts, including but not limited to damages for emotional distress, harm to reputation, and pecuniary loss;

ii.   For punitive damages against all Defendants, due to their malicious, fraudulent, oppressive, and reckless conduct;

iii.   For pre-judgment and post-judgment interest at the highest lawful rate;

iv.   For costs of this action and reasonable attorneys' fees, where applicable;

v.   For such other and further relief as this Court deems just and proper.

## JURY DEMAND
Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated this **1 3** day of January, 2026.

PLAINTIFF'S ORIGINAL COMPLAINT - 23

Respectfully Submitted,

## CERTIFICATE OF SERVICE

I hereby certify that on this \3 day of January , 2026, I caused a true and correct copy of the foregoing Complaint and Jury Demand to be served upon the following Defendants by United States Mail, first-class postage prepaid, addressed as follows:

**Square One Transport, Inc.**

761 Lanac Street
Lansing, MI 48917


**Dean J. Thelen**

761 Lanac Street
Lansing, MI 48917

Mahamadou Konate
Plaintiff, Pro Se
830 Furlong Dr
Lexington, KY 40504

Plaintiff in *pro per*